UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 22-1144 JGB (SHKx)** | Date | February 21, 2023 |
| Title | ***Shenzhen Yangjinmaoyi Co., Ltd., et al. v. Hangzhou Chic Intelligent Technology Co., Ltd., et al.*** | | |

| | |
|---|---|
| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |

| | |
|---|---|
| MAYNOR GALVEZ | Not Reported |
| Deputy Clerk | Court Reporter |
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| None Present | None Present |

**Proceedings:** **Order (1) GRANTING-IN-PART Defendants' Motion to Dismiss (Dkt. No. 25; (2) GRANTING-IN-PART Defendants' Motion to Strike (Dkt. No. 24); (3) DENYING Plaintiffs' Motion for Leave to Conduct Limited Scope Discovery (Dkt. No. 31); and (4) VACATING the February 27, 2023 Hearing (IN CHAMBERS)**

Before the Court are: (1) defendants Hangzhou Chic Intelligent Technology Co., Ltd. ("Chic Intelligent"), Zhejiang Chic Robot Techonology Co., Ltd. ("Chic Robot"), and Unicorn Global, Inc. ("Unicorn") (collectively, "Defendants") motion to dismiss ("MTD," Dkt. No. 25); (2) Defendants' motion to strike ("MTS," Dkt. No. 24); and (3) plaintiffs Shenzhen Yangjinmaoyi Co., Ltd., d.b.a Yanjin-US ("Yanjin"), and Shenzhen Chetaidou Keji Youxian Gongsi ("Chetaidou") (collectively, "Plaintiffs") motion for leave to conduct limited scope of discovery in support of their opposition to Defendants' MTS ("MLD," Dkt. No. 31) (collectively, "Motions"). The Court finds these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering all papers timely filed in support of, and in opposition to the Motions, the Court **GRANTS-IN-PART** Defendants' MTD, **GRANTS-IN-PART** Defendants' MTS, and **DENIES** Plaintiffs' MLD. The February 27, 2023 hearing on the Motions is **VACATED**.

## I. BACKGROUND

On July 6, 2022, plaintiff Yanjin filed a complaint against defendants Chic Intelligent and Unicorn. ("Yanjin Complaint," Dkt. No. 1.) The Complaint alleges six causes of action: (1)

violation of Section 1 of the Sherman Act (15 U.S.C. § 1); (2) violation of Section 2 of the Sherman Act (15 U.S.C. § 2); (3) violation of the California Cartwright Act (Cal. Bus. & Prof. Code § 16720); (4) violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200; (5) tortious interference with contractual relationship; and (6) tortious interference with prospective economic advantage. (See Yanjin Compl.)

On July 20, 2022, plaintiff Chetaidou filed a similar complaint against defendants Chic Robot, Chic Intelligent, and Unicorn in a different action before this Court. See Shenzhen Chetaidou Keji Youxian Gongsi v. Zhejiang Chic Robot Technology Co., Ltd., et al., No. 5:22-cv-1271-JGB (SHKx) ("Chetaidou Complaint"). On August 5, 2022, the parties in the Chetaidou Action and this action filed a joint stipulation requesting that the Court consolidate both actions. (Dkt. No. 17.) On October 11, 2022, the Court consolidated the two actions and ordered that the master docket and master file be maintained under this action, Case No. 22-cv-01144-JGB-SHK. (Dkt. No. 39.)

On September 15, 2022, Defendants filed their MTS. (See MTS.) On October 17, 2022, Chetaidou opposed. ("Chetaidou MTS Opp'n," Dkt. No. 28.) On the same day, Yanjin opposed. ("Yanjin MTS Opp'n," Dkt. No. 29.) On October 24, 2022, Defendants replied. ("MTS Reply," Dkt. No. 32.)

On September 15, 2022, Defendants filed their MTD. (See MTD.) On October 17, 2022, Chetaidou opposed. ("Chetaidou MTD Opp'n," Dkt. No. 27.) On the same day, Yanjin opposed. ("Yanjin MTD Opp'n," Dkt. No. 30.) On October 24, 2022, Defendants replied. ("MTD Reply," Dkt. No. 33.)

On October 17, 2022, Plaintiffs filed their MLD. (See MLD.) On October 24, 2022, Defendants opposed. ("MLD Opp'n," Dkt. No. 34.) On October 27, 2022, Plaintiffs replied. ("MLD Reply," Dkt. No. 35.)

## II. FACTUAL ALLEGATIONS

The Chetaidou Complaint contains 33 pages of factual allegations against Defendants, which largely mirror those in the Yanjin Complaint. The Court recounts here only those allegations necessary to the adjudication of the Motions.

### A. The Parties

Plaintiffs Chetaidou and Yanjin are Chinese companies. (Yanjin Compl. ¶ 4.) Chetaidou is the manufacturer and seller of Gyroor products and owns and operates an Amazon storefront named Gyroor. (Chetaidou Compl. ¶ 4.) In early 2015, Chetaidou registered its trademark "Gyroor" in the U.S. and is the owner of various U.S. design patents. (Id. ¶ 5.) Chetaidou's hoverboard products are designed and manufactured solely based on Chetaidou patents. (Id.) Yanjin owns and operates an Amazon storefront named Yanjin-US where Yanjin sells

Chetaidou's Gyroor-brand Electric Roller Skates, also known as "hover shoes" through its Amazon storefront. (Yanjin Compl. ¶ 4.)

Defendants Chic Robot and Chic Intelligent (collectively, "Chics") are Chinese companies that manufacture, import, export, distribute, and sell hoverboard products in the U.S. (Chetaidou Compl. ¶ 6.) The Chics share the same management team, business address, and Chic Robot has a controlling interest in Chic Intelligent. (Id. ¶ 7.) Defendant Unicorn is the exclusive U.S. distributor of the Chics' products. (Id. ¶ 8.) Defendants entered into an exclusive distribution agreement, are the parties of various settlement and/or licensing agreements, and are listed as co-plaintiffs in various patent infringement cases. (Id. ¶ 9.)

**B. Relevant Market**

The antitrust product market restrained by Defendants are the self-balancing electric scooter market and the hoverboard market. (Chetaidou Compl. ¶ 12; Yanjin Compl. ¶ 11.) A self-balancing electric scooter (also known as hoverboard, self-balancing board, or electric scooter board) is a self-balancing personal transporter consisting of two motorized wheels connected to a pair of articulated pads on which the rider places their feet. (Yanjin Compl. ¶ 12.) The rider controls the speed by leaning forwards or backwards, and changes the direction of travel by twisting the pads. (Id.) Hoverboards, known as self-balancing scooters, are portable electric devices that move on two wheels and are powered by lithium-ion batteries that are rechargeable. (Chetaidou Compl. ¶¶ 13-14.) On a hoverboard, a rider is suspended on a platform between the two wheels and when a rider leans forward, backward, right or left, the wheels move in that direction. (Id.) As of 2019, Swagway LLC ("Swagway"), Tomoloo Technology Industrial Co., Ltd. ("Tomoloo"), and Defendants have held significant market shares of self-balancing electric scooters in the world. (Id. ¶ 23.)

**C. Defendants' Litigation Against Plaintiffs**

On or about August 17, 2020, Defendants initiated a lawsuit against numerous defendants, including Chetaidou,[1] captioned ABC Corporation I, et al. (Hangzhou Chic Intelligent Technology Co., Ltd and Unicorn Global, Inc.) v. The Partnerships and Unincorporated Associations Identified on Schedule "A", No. 1:20-cv-04806 (E.D. Ill) in the United State District Court for the Northern District of Illinois (the "Illinois Lawsuit"). (Chetaidou Compl. ¶¶ 33, 39; Yanjin Compl. ¶ 51.) In the Illinois Lawsuit, Defendants allege that four of the Chics' U.S. design patents have been infringed by the Gyroor-branded products made or sold by Chetaidou. (Chetaidou Compl. ¶ 37.) On November 24, 2020, the district court

[1] It is unclear whether Chetaidou and Yanjin were both originally named as defendants in the Illinois Lawsuit. Plaintiffs state that Defendants initiated the Illinois lawsuit against both of them on August 17, 2020. (Chetaidou Compl. ¶ 33, Yanjin Compl. ¶¶ 51, 56). But they also state that they were both non-parties in that lawsuit. (Chetaidou Compl. ¶¶ 41, 58.) Based on the Court's understanding of Plaintiffs' allegations, the Court assumes Defendants first initiated the suit against Chetaidou and later named Yanjin as a defendant in the Illinois Lawsuit.

entered a preliminary injunction order ("First Preliminary Injunction Order") against defendants who operate e-commerce stores under one or more seller alias. (Id. ¶¶ 39-40.) Defendants enforced this injunction order against non-parties including various resellers of Chetaidou's Gyroor-branded products and other competitors. (Id. ¶ 41.) Without notice, the Amazon storefronts operated by Chetaidou, resellers of the Gyroor-branded products, and other competitors, were frozen due to the injunction order and their relevant assets were restrained. (Id. ¶ 42.) On May 6, 2021, Chetaidou's websites, Gyroor.com and Gyroorboard.com, were shut down and their host accounts were suspended or frozen due to the First Preliminary Injunction Order. (Id. ¶ 69.) Chetaidou lost its ability to sell any hoverboard products through its websites and market its hoverboard products to the public. (Id.)

Thereafter, Defendants moved the district court in the Illinois Lawsuit to add non-parties as defendants to the suit by alleging that the non-parties are acting as affiliates with Chetaidou. (Id. ¶ 43.) On October 13, 2021,[2] without vacating the first preliminary injunction order, the district court granted a second preliminary injunction order and added additional non-parties who sell Gyroor-branded products ("Second Preliminary Injunction Order"). (Id. ¶¶ 47-48.)

On October 21, 2021, plaintiff Yanjin, one of Chetaidou's sellers, received a notice from Amazon stating that its listings were removed because Yanjin infringed Defendants' patents. (Id. ¶ 56.) Amazon suggested that Yanjin contact Defendants' counsel in the Illinois Lawsuit. (Id.) On April 4, 2022, Defendants admitted that Yanjin was wrongfully restrained and should not have had its assets restrained in the Illinois Lawsuit. (Id. ¶ 59.) Defendants' hoverboard patents and Yanjing's hover shoe products are dissimilar. (Id. ¶¶ 62-63.) On April 18, 2022, Yanjin requested to have its Amazon account "released" by Defendants. (Id. ¶ 60.) Defendants failed to clarify with Amazon the wrongful enforcement of the injunction and removal of Yanjin's listings.[3] (Yanjin Compl. ¶ 35.) Defendants' actions forced Yanjin to remove its listings, close its

---

[2] It is unclear when the preliminary injunction was granted. (Compare Yanjin Compl. ¶ 27 (alleging that the preliminary injunction order was granted on October 6, 2021) with Chetaidou Compl. ¶ 47 (alleging that the preliminary injunction order was granted on October 13, 2021).)

[3] In the Chetaidou Complaint, plaintiff Chetaidou includes an exhibit of a motion ("Motion") filed by defendants Chic Intelligent and Unicorn in the Illinois Lawsuit. (See Chetaidou Compl., Ex. 1.) The Court considers the exhibit because it is attached to the Chetaidou Complaint and its authenticity is not questioned by either party. See Griffin v. Green Tree Servicing, LLC, 166 F. Supp. 3d 1030, 1039 (C.D. Cal. 2015) (On a motion to dismiss, a court may "properly consider exhibits attached to the complaint and documents whose contents are alleged in the complaint but not attached, if their authenticity is not questioned."). In the Motion, Chic Intelligent and Unicorn argue that they repeatedly supported lifting the restrictions that Amazon placed on Yanjin by contacting Amazon and that they also support the release of Yanjin from the Illinois Lawsuit preliminary injunction order. (See Motion.) This seems contrary to Plaintiffs' allegations that Defendants did not "clarify" with Amazon that Yanjin's assets were wrongfully frozen.

business on Amazon and cease selling any of Chetaidou's Gyroor-branded products. (Chetaidou Compl. ¶ 63.)

On June 4, 2021, Defendants told Amazon Germany that Chetaidou's Gyroor-branded hoverboard products infringed Defendants' patents. (Id. ¶ 70.) Subsequently, a listing of a reseller who sells Chetaidou's hoverboard products in Germany was removed from Amazon marketplace. (Id.)

On June 7, 2021, Defendants told Amazon U.K. that Chetaidou's Gyroor-branded hoverboard products infringed Defendants' patents. (Id. ¶ 71.) Subsequently, a listing of a reseller who sells Chetaidou's hoverboard products in the U.K. was removed from Amazon marketplace. (Id.)

On November 1, 2021, Defendants contacted Amazon Germany again and another listing of a reseller who sells Chetaidou's hoverboard products in Germany was removed from Amazon marketplace. (Id. ¶ 72.) On June 16, 2022, Defendants contacted Amazon Canada and a listing of a reseller who sells Chetaidou's Gyroor-branded hoverboard products in Canada was removed from Amazon marketplace. (Id. ¶ 73.) On June 23, 2022, Defendants complained to Amazon U.K. again and another listing of a reseller who sells Chetaidou's Gyroor-branded hoverboard products in the U.K. was removed from Amazon marketplace. (Id. ¶ 74.)

On average, each Chetaidou reseller has lost approximately $100,000 U.S. dollars due to the removal of their listings. (Id. ¶ 75.) All resellers have ceased purchasing anything from Chetaidou and/or selling any Gyroor-brand products because they are afraid that their assets may be restrained or their listings may be removed if they sell Gyroor-branded products. (Id. ¶ 76.) Chetaidou has been eliminated from the hoverboard market because it is unable to sell any hoverboard products to any consumers in the United States and around the world. (Id.)

**D. Defendants' Litigation Against Other Competitors**

In early August 2016, Defendants started to issue Cease & Desist letters to more than a dozen resellers for Swagway LLC, one of its biggest competitors in the hoverboard market, demanding immediate desistance of patent infringement activities. (Id. ¶ 28.) That same month, Chic Intelligence brought a patent infringement lawsuit against Swagway, LLC. (Id. ¶ 29.) That same year, Chic Intelligence filed another patent infringement lawsuit against Razor USA, LLC, another hoverboard competitor. (Id. ¶ 30.) In 2018 and 2019, Defendants lodged complaints with Amazon, asserting that hoverboards sold and produced by its competitor, Golabs, Inc. infringed on Defendants' design patents. (Id. ¶ 31.) On March 2019, defendant Unicorn brought a patent infringement lawsuit against Golabs, Inc. (Id. ¶ 32.)

On October 2, 2020, Chic Intelligent and Unicorn initiated another patent infringement lawsuit against various defendants including some of Chetaidou's resellers and Tomoloo Technology Industrial Co., Ltd., a hoverboard competitor. (Id. ¶ 34.) On March 18, 2021, Defendants filed a patent infringement lawsuit against its competitor DGL. (Id. ¶ 35.) In most of

Defendants' lawsuits, the parties have reached settlement by signing licensing and/or settlement agreements and/or paying royalties to Defendants. (Id. ¶ 67.) Defendants have also threatened to file patent infringement lawsuits against various competitors and their resellers by issuing numerous demand letters. (Id. ¶ 36.)

## III. LEGAL STANDARD

### A. Motion to Dismiss

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Ileto v. Glock Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994). Courts are not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Scis. Sec. Litig., 536 F.2d 1049, 1055 (9th Cir. 2008) (internal citation and quotation omitted). Courts also need not accept as true allegations that contradict facts which may be judicially noticed. See Mullis v. U.S. Bankr. Court, 828 F.2d 1385, 1388 (9th Cir. 1987).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570; Ashcroft v. Iqbal, 556 U.S. 662 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

//

### B. Anti-SLAPP Motion to Strike

California's so-called anti-SLAPP law allows a defendant to file a special motion to strike certain claims that arise "from any act of [the defendant] in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b) ("Section 425.16"). The California anti-SLAPP statute "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 839 (9th Cir. 2001). Under § 425.16(g) "the filing of an anti-SLAPP motion automatically stays all further discovery until the court rules on the motion." Id. at 846. Defendants sued in federal court are entitled to bring such anti-SLAPP motions to strike state law claims. Verizon Del., Inc. v. Covad Commc'ns Co., 377 F.3d 1081, 1091 (9th Cir. 2004). Although it is not a federal rule or law, the Ninth Circuit has held that "California's anti-SLAPP statute . . . supplements rather than conflicts with the Federal Rules." Makaeff v. Trump Univ., LLC, 736 F.3d 1180, 1182 (9th Cir. 2013).

Under California law, courts deciding an anti-SLAPP motion to strike must engage in a two-step process. Equilon Enters. v. Consumer Cause, Inc., 29 Cal. 4th 53, 67 (2002). First, "the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." Id. Second, "[i]f the court finds such as showing has been made, it then determines whether the plaintiff has demonstrated probability of prevailing on the claim." Id. The Ninth Circuit has adopted this process. See Hilton v. Hallmark Cards, 599 F.3d 894, 903 (9th Cir. 2010).

## IV. DISCUSSION

### A. Motion to Dismiss

Defendants argue that Plaintiffs fail to state any claim against them. (See MTD.) In addition to moving to dismiss the California state law claims against them, Defendants have also filed a Motion to Strike them under the California anti-SLAPP statute. (See MTS.)

#### 1. Sherman Act Claims (Claim One and Two)

Defendants move to dismiss Plaintiffs two causes of action alleging violations of Section 1 and 2 of the Sherman Act. (MTD at 10.) Defendants argue that the Noerr-Pennington doctrine protects their enforcement activities against infringers and that the sham litigation exception does not apply to Defendants' prior lawsuits. (MTD at 8, 10.) For the reasons explained below, the Court agrees.

The Noerr-Pennington doctrine provides that "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." Sosa v. DIRECTV, Inc., 437 F.3d 923, 929 (9th Cir. 2006). "Under the Noerr–Pennington rule of statutory construction, [courts] must construe federal statutes so as to avoid

burdening conduct that implicates the protections afforded by the [First Amendment] unless the statute clearly provides otherwise." Sosa, 437 F.3d at 931. A party's actions of filing briefs and motions in a prior suit "constitute core petitioning activity that the Noerr-Pennington doctrine immunizes from civil liability." Williams v. Jones & Jones Mgmt. Grp., Inc., 2015 WL 349443, at *9 (C.D. Cal. Jan. 23, 2015). Noerr–Pennington applies to litigation in all contexts. White v. Lee, 227 F.3d 1214, 1231 (N.D. Cal. 2013).

Moreover, this doctrine applies "not only [to] petitions sent directly to the court in the course of litigation, but also [to] 'conduct incidental to the prosecution of the suit.' " Sosa, 437 F.3d at 934. Indeed, under Sosa, "all communications between private parties related to litigation—including presuit demand letters and settlement offers—are entitled to immunity." EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp., 711 F. Supp. 2d 1074, 1082 (C.D. Cal. 2020). However, "sham" litigation does not fall within the doctrine's protection. Freeman v. Lask v. Haas & Cohler, 410 F.3d 1180, 1183-184 (9th Cir. 2005). "Litigation will be labeled a sham if it is objectively baseless, and conceals an attempt to interfere directly with the business relationships of a competitor." Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc., 863 F.3d 1178, 1187 (9th Cir. 2017) (internal quotes omitted). "In the context of a series of alleged sham proceedings, however, 'the question is not whether any one [suit] has merit ... but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.'" (Id. (quoting USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO, 31 F.3d 800, 811 (9th Cir. 1994)). In such a context, the legal success of an occasional sham suit is irrelevant. Id.

Here, Plaintiffs assert that they seek to hold Defendants liable for asserting a pattern of allegedly baseless claims. (Chetaidou MTD Opp'n at 13; Yanjin MTD Opp'n at 13-14.) Plaintiffs list out examples of Defendants' lawsuits against other competitors, but they do not allege that those lawsuits are meritless. (See Chetaidou Compl. ¶¶ 28-35.) Plaintiffs merely allege that in most of Defendants' lawsuits against other competitors, parties have reached settlement by signing licensing and/or settlement agreements and/or paying royalties to Defendants. (Id. ¶ 67.) Thus, to the extent that Plaintiffs argue that they allege a pattern of baseless claims, there are no allegations that Defendants instituted those lawsuits with or without probable cause, and regardless of the merits of the case. See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 512 (1972) (finding that allegations that trucking companies conspired to monopolize trade and commerce in transportation of goods and that they engaged in concerted activities to institute actions with or without probable cause and without regard to the merits in state and federal proceedings were on their face within the sham exception). Thus, the Court finds that Plaintiffs fail to adequately plead a pattern of baseless claims.

Because Plaintiffs have not adequately alleged a pattern of baseless claims, the Court now engages in a two-step inquiry to evaluate Plaintiffs' allegations regarding the Illinois Lawsuit. "Step one asks whether the alleged sham suit was meritless." Int'l Longshore & Warehouse Union, 863 F.3d 1178, 1187 (9th Cir. 2017). "The burden is on 'the plaintiff to disprove the challenged lawsuit's legal viability.'" Id. (quoting Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 50 (1993)). "'Only if challenged litigation is objectively meritless may a

court' proceed to step two to analyze whether the baseless suit was an attempt to directly interfere with the business of a competitor." Id. (quoting Pro. Real Est. Invs., Inc., 508 U.S. at 60-61).

Plaintiffs allege that the gravamen of Defendants' claim in the Illinois Lawsuit is that four of the Chics' U.S. design patents have been infringed by the Gyroor-branded products made or sold by Chetaidou. (Chetaidou Compl. ¶ 37.) At no point in their complaints do Plaintiffs allege that Defendants' suit is baseless, that "no reasonable litigant could realistically expect success on the merits." Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 50 (1993). Instead, Plaintiffs take issue with the preliminary injunction orders in the Illinois Lawsuit. Plaintiffs argue that Defendants should not have added re-sellers like Yanjin as defendants to the Illinois Lawsuit and should not have enforced the preliminary injunction orders against Yanjin because Yanjin was selling Chetaidou's hover shoes, which are different from the hoverboard products that Defendants sell. (Chetaidou MTD Opp'n at 13; Yanjun MTD Opp'n at 13.) Defendants argue that they never sought a preliminary injunction or any other relief relating to Plaintiffs' hover shoes. (MTD Reply at 11.) To the extent that Plaintiffs are discontent with the reach of the Illinois Lawsuit preliminary injunction orders, that discontentment is better addressed with the district court presiding over the Illinois Lawsuit.[4] Based on the alleged facts before it, the Court is unable find that Plaintiffs have adequately plead that the Illinois Lawsuit is objectively meritless. Accordingly, the Court **GRANTS** Defendants' MTD as to Plaintiffs' Sherman Act claims.

### 2. Claim Three: California Cartwright Act

Defendants argue that Plaintiffs fail to state a claim under the Cartwright Act because Plaintiffs have alleged no agreement, conspiracy, or combination between or among two or more entities. (MTD at 14.) A cause of action for violation of the Cartwright Act "must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts." Chavez v. Whirlpool Corp., 93 Cal. App. 4th 363, 373 (2001) (internal citations omitted). Plaintiffs argue that they have alleged a conspiracy because they alleged that Chic Intelligent and Unicorn entered into an exclusive distribution agreement, are the parties of settlement and licensing agreements, and are listed as co-plaintiffs in various patent infringement cases. (Chetaidou Compl. ¶ 9.) They further allege that the fact that Defendants acted in concert by wrongfully enforcing the preliminary injunction order against Chetaidou's resellers, such as Yanjin, is proof of Defendants' agreement. (Yanjin MTD Opp'n at 24.)

The Court disagrees with Plaintiffs. The fact that Chic Intelligent and Unicorn allegedly entered into an exclusive distribution agreement, which Plaintiffs fail to further describe, is

[4] The Court has serious doubts about whether the Central District of California is the proper venue for Plaintiffs' lawsuit. A transfer under 28 U.S.C. 1404(a) "may be ordered sua sponte so long as the parties have the opportunity to present their views on the issue." Berman v. Brown, 2015 WL 4735522, at *2 (N.D. Cal. Aug. 10, 2015) (internal quotes omitted).

insufficient to establish that Defendants engaged in a conspiracy. See, e.g., JM Computer Servs. v. Schlumberger Techs., 1996 U.S. Dist. LEXIS 21885 (N.D. Cal. May 3, 1996) ("Plaintiff has failed to plead an exclusive dealing claim, as it has failed to identify an agreement with a specific person or entity and does not identify the parts, services, or contracts involved in the alleged exclusive dealing."). Additionally, the fact that Defendants initiated a patent infringement lawsuit against Plaintiffs, a lawsuit in which a district court has granted preliminary injunction orders which are based on a party's likelihood of success on the merits, is also insufficient to plead that there is a conspiracy. Plaintiffs have not cited any case law demonstrating that such facts are sufficient to adequately plead a conspiracy, and the Court has found none. Accordingly, the Court **GRANTS** Defendants' MTD as to Plaintiff's Cartwright Act claim.

### 3. Claim Four: California Unfair Competition Law

Defendants move to dismiss Plaintiff's California Unfair Competition Law ("UCL") claim. (MTD reply at 12-13.) To state a UCL claim, "a plaintiff must show either an (1) unlawful, unfair, or fraudulent business act or practice, or (2) unfair, deceptive, untrue or misleading advertising." Kemp v. Wells Fargo Bank, N.A., 2017 WL 4805567, at *15 (N.D. Cal. Oct. 25, 2017) (internal quotes omitted). Plaintiffs invoke the fraudulent prong of UCL. (See Chetaidou MTD Opp'n at 24.) "To state a claim under the fraudulent prong of the UCL, "it is necessary only to show that members of the public are likely to be deceived" by the business practice or advertising at issue." AlterG, Inc. v. Boost Treadmills LLC, 388 F. Supp. 3d 1133, 1156 (N.D. Cal. 2019) (citing In re Tobacco II Cases, 46 Cal. 4th 298, 312 (2009)).

Before evaluating the substance of Plaintiffs' claim under the fraudulent prong, the "Court must ensure that [Plaintiffs] have standing to bring the claim." Id. "The UCL limits standing to those individuals who have 'suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition.'" Id. (citing Cal. Bus. & Prof. Code § 17204). "The California Supreme Court has interpreted this standing provision as 'impos[ing] an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong.'" Id. (quoting In re Tobacco II Cases, 46 Cal. 4th at 326). Thus, "courts have recognized that UCL fraud plaintiffs must allege their own reliance—not the reliance of third parties—to have standing under the UCL." O'Connor v. Uber Techs., Inc., 58 F. Supp. 3d 989, 1002 (N.D. Cal. 2014).

Here, Plaintiffs' UCL fraud claim is based on the allegedly false statements that Defendants made to Amazon regarding Yanjin's sale of hover shoes and Defendants' allegedly sham litigation. (Yanjin MTD Opp'n at 25.) Plaintiffs allege that Defendants informed Amazon that Yanjin was selling patently infringed hover shoes, which likely caused Amazon to be deceived by Defendants' communications. (Yanjin Compl. ¶ 40.) Defendants' actions allegedly caused Plaintiffs' reputation and Amazon store ranking to be ruined. (Id.) Plaintiffs also argue that Defendants wrongfully enforced the preliminary injunction order against Yanjin. (Chetaidou MTD Opp'n at 25-26.) Notably, there is no allegation in either of the complaints that Plaintiffs themselves relied on Defendants' statements. Accordingly, Plaintiffs do not have standing under the UCL to pursue a claim under the fraudulent prong. See AlterG, Inc. v. Boost Treadmills

LLC, 388 F. Supp. 3d at 1156 (finding that because plaintiff's fraud claims are predicated on the allegedly false statements defendants made to customers and prospects and there is no allegation that plaintiff itself relief on defendants' statements, plaintiff does not have standing under the UCL). Thus, the Court **GRANTS** Defendants' MTD as to Plaintiff's UCL claim.

**4. Claim Five: Tortious Interference with Contractual Relationship**

Defendants move to dismiss Plaintiffs' claims of tortious interference with contractual relationship because Plaintiffs fail to allege that Defendants knew or intended to interfere with any of Plaintiffs' business dealings. (MTD at 16-17.) The Court disagrees. To state a claim for "intentional interference with contractual relations, a plaintiff must allege: '(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" UMG Recordings, Inc. v. Glob. Eagle Ent., Inc., 117 F. Supp. 3d 1092, 1115 (C.D. Cal. 2015) (Quelimane Co. v. Stewart Title Guar. Co., 19 Cal.4th 26, 55 (1998)).

Here, Plaintiffs allege that they had a "valid and existing contract with Amazon to sell its hoverboard products through its Amazon storefront." (Chetaidou Compl. ¶ 124.) Plaintiffs also allege that Chetaidou had a "valid and existing contract with its resellers to sell its hoverboard products to resellers and/or consumers." (Id. ¶ 125.) They allege that Defendants "knew or should have known of" Plaintiffs' contractual relationships with Amazon and its resellers because Defendants made false allegations to Plaintiffs' Amazon storefront. (Yanjin Compl. ¶ 99.) They allege that Defendants intentionally interfered with Plaintiffs' contractual relationships with Amazon and Chetaidou's resellers because Defendants added Chetaidou's resellers, such as Yanjin, to the Preliminary Injunction Order and requested Amazon to remove Plaintiffs' hoverboard product listing and to freeze their relevant assets. (Chetaidou Compl. ¶ 127.) Plaintiffs allege that Defendants communicated to Amazon in the U.S., Germany, and the U.K. that Plaintiffs' assets needed to be restrained due to the Illinois Lawsuit (Chetaidou Compl. ¶¶ 56-59, 70-74). They allege that as a result of Defendants' actions, Plaintiffs' products were delisted and Plaintiffs suffered damages. (Id. ¶¶ 128-29.) Thus, Plaintiffs have adequately alleged that Defendants knew of Plaintiffs' contractual relationships with Amazon and intended to interfere with Plaintiffs' contractual relationships. Accordingly, the Court **DENIES** Defendants' MTD as to Plaintiffs' tortious interference with contractual relationship.

**5. Claim Six: Tortious Interference with Prospective Economic Advantage**

Defendants move to dismiss Plaintiffs' claims of tortious interference with prospective economic advantage because Plaintiffs fail to allege that Defendants knew or intended to interfere with any of Plaintiffs' business dealings. (MTD at 16-17.) To plead a claim for intentional interference with prospective economic advantage, a plaintiff must allege: "(1) an economic relationship between plaintiff and a third party, with the probability of future economic benefit to plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the party of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; (5)

economic harm to the plaintiff proximately caused by the acts of the defendant." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (Cal. 2003). The third element of intent "requires a plaintiff to plead intentional wrongful acts on the part of the defendant designed to disrupt the relationship." Id. at 1154. Additionally, to satisfy the intent requirement, "it is sufficient to plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." Id.

For the reasons discussed above, Plaintiffs have sufficiently plead that Defendants had knowledge of Plaintiffs' relationship with Amazon. As to Defendants' argument that Plaintiffs fail to allege that Defendants intended to interfere, Defendants specifically argue that Plaintiffs overlook the fact that Defendants are within their rights as patent holders to pursue enforcement action against potential infringers, and thus Plaintiffs have failed to show that Defendants' actions were independently wrongful acts by Defendants. (MTD at 16.)

A "plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful by some measure beyond the fact of the interference itself." Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 392–93 (1995) (internal quotes omitted). "An act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard . . . an act must be wrongful by some legal measure, rather than merely a product of an improper, but lawful, purpose or motive." San Jose Constr., Inc. v. S.B.C.C., Inc., 155 Cal. App. 4th 1528, 1544–45 (2007). "An act is not independently wrongful merely because defendant acted with an improper motive." Korea Supply Co., 29 Cal. 4th at 1158.

Plaintiffs claim that Defendants' wrongful act is that they added Yanjin to the preliminary injunction order and requested that Amazon remove Plaintiffs' hoverboard product listing and to restrain Plaintiffs' assets. (Chetaidou MTD Opp'n at 28.) Plaintiffs allege that once Yanjin was notified by Amazon that its assets were frozen, Yanjin contacted Defendants. (Yanjin Compl. ¶¶ 29-31.) Plaintiffs allege that Defendants conducted a "lengthy investigation" and admitted that Yanjin was wrongfully restrained. (Id. ¶ 32.) Plaintiffs allege that Yanjin asked Defendants to have Amazon release its account, but that Defendants failed to clarify with Amazon that Yanjin had been wrongfully enjoined. (Id. ¶ 35.) Construing Plaintiffs' allegations in the light most favorable to them, Plaintiffs allegations raise an inference that Defendants may have acted with an improper motive in including Yanjin in the injunction orders. However, an improper motive does not constitute wrongful conduct for the purposes of Plaintiffs' tort claim. See Korea Supply Co., 29 Cal. 4th at 1158 ("An act is not independently wrongful merely because defendant acted with an improper motive."). Plaintiffs have not pointed to any case law supporting their argument that a defendant that allegedly included a party into a preliminary injunction order, enforced that injunction order, and later admitted that it should not have included that party constitutes "wrongful" conduct, and the Court is unable to find such a case. Accordingly, the Court **GRANTS** Defendants' MTD as to Plaintiffs' tortious interference with prospective economic advantage claim.

**B. Motion to Strike**

Defendants have brought a motion to strike Plaintiffs' state law claims under the California anti-SLAPP statute. Section 425.16 requires a two-step analysis. First, the court decides whether the Defendants have made the threshold showing that the challenged claim is one arising from protected activity. Navellier v. Sletten, 29 Cal.4th 82, 88-89 (2002). Second, if the Defendants have made a prima facie showing that the Plaintiff's claim arises from protected activity, and the anti-SLAPP statute therefore applies, the court proceeds to the merits of the claim. Id.

The Court finds that Defendants have made a threshold showing that the challenged claims are ones arising from protected activity. A defendant meets his burden of making an initial prima facie case that plaintiff's suit arises from an act in furtherance of defendant's right of petition or free speech "by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in Code Civ. Proc., § 425.16, subd. (e)" which include: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." Braun v. Chron. Publ'g Co., 52 Cal. App. 4th 1036, 1042 (1997). "'At least as to acts covered by clauses one and two of section 425.16, subdivision (e), the statute requires simply any writing or statement made in, or in connection with an issue under consideration or review by, the specified proceeding or body.'" Briggs v. Eden Council for Hope & Opportunity, 19 Cal. 4th 1106, 1116 (1999) (quoting Braun, 52 Cal. App. 4th at 1038).

Here, all of Plaintiffs' state law claims against Defendants are premised on Defendants' patent infringement lawsuit against Plaintiffs, which is a written statement made before a judicial proceeding that falls under protected activity. Plaintiffs' tortious interference with contractual relationship and prospective economic advantage claims are also based on Defendants' statements to Amazon. (Chetaidou Compl. ¶¶ 56-59, 70-74; Chetaidou MTD Opp'n at 27.) Plaintiffs argue that the statements Defendants made to Amazon were not made before any judicial proceeding, and thus are not protected activity. (Chetaidou MTS Opp'n at 12.) But the statute only requires that the statement is made in connection with an issue under consideration or review by a judicial body. See Briggs, 19 Cal. 4th at 1116. Thus, because Plaintiffs allege that Defendants made statements to Amazon that Plaintiffs' products infringed Defendants' patents in connection with Defendants' Illinois Lawsuit, Defendants statements to Amazon are protected activity. (See Chetaidou Compl. ¶ 56.)

Because Defendants have made a prima facie showing that Plaintiffs' claims arise from protected activity, and the anti-SLAPP statute applies, the Court proceeds to the merits of the claims. Equilon Enters, 29 Cal. 4th at 67. Plaintiffs must "show a probability of prevailing on the challenged claim[s]." Nunes v. Meredith, 2022 WL 2214205, at *3 (E.D. Cal. June 21, 2022). "At this second step of the anti-SLAPP inquiry, the required probability that [Plaintiffs] will prevail need not be high. The California Supreme Court has sometimes suggested that suits

subject to being stricken at step two are those that 'lack [ ] even minimal merit.'" Hilton v. Hallmark Cards, 599 F.3d 894, 908 (9th Cir. 2010) (quoting Navellier v. Sletten, 29 Cal. 4th 82, 89, 52 P.3d 703, 708 (2002) ("Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.")).

The Ninth Circuit has further held that when a motion to strike under the anti-SLAPP statute challenges only the legal sufficiency of a claim, "then the plaintiff can properly respond merely by showing sufficiency of pleadings, and there's no requirement for a plaintiff to submit evidence to oppose contrary evidence that was never presented by defendants." Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress, 890 F.3d 828, 834 (9th Cir.), amended, 897 F.3d 1224 (9th Cir. 2018).

**1. Claim Three: California Cartwright Act**

Instead of explaining why their complaints are legally sufficient, Plaintiffs argue that the Court should interpret Defendants' MTS as arguing that Plaintiffs have failed to submit evidence and thus the MTS should be treated as a motion for summary judgment under Rule 56. (Chetaidou MTS Opp'n at 17.) If the Court agrees with Plaintiffs and treats Defendants' MTS as a motion for summary judgment, Plaintiffs ask that the Court allow Plaintiffs to conduct discovery to determine whether there was any agreement, conspiracy, or combination between or among Defendants under the Cartwright Act. (Id.) To support this request Plaintiffs filed its MLD, a motion for leave to conduct a limited scope discovery for Plaintiffs Cartwright Act claim. (See MLD.)

When "an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated. And, on the other hand, when an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard will apply. But in such a case, discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court." Planned Parenthood Fed'n of Am., Inc., 890 F.3d at 834.

Plaintiffs mischaracterize Defendants' MTS. Defendants do not argue that Plaintiffs failed to submit evidence.[5] Defendants only challenge the legal sufficiency of Plaintiffs' claim. (See MTS.) For example, Defendants repeatedly argue in their MTS that Plaintiffs "simply do not plead any facts" to support their state law claims. (MTS at 8.) Thus, there is no need for the Court to treat Defendants' MTS as a motion for summary judgment. Instead "the Rule 12(b)(6) standard is appropriate because [Defendants] primarily focus on the legal sufficiency of

[5] If Defendants had challenged the factual sufficiency of Plaintiffs' claims in their anti-SLAPP motion to strike, then Plaintiffs are correct that Rule 56 would apply and the Court must allow discovery. See Planned Parenthood Fed'n of Am., Inc., 890 F.3d at 834.

[Plaintiffs'] claims as plead in the complaint[s]." Nunes v. Meredith, 2022 WL 2214205, at *7 (E.D. Cal. June 21, 2022). And because Defendants have "urged only insufficiency of pleadings," Plaintiffs merely need to show the sufficiency of their pleadings to show a probability of prevailing on their challenged claim. Planned Parenthood Fed'n of Am., Inc., 890 F.3d at 834. However, as the Court explained above, Plaintiffs fail to make that showing because they did not sufficiently plead a conspiracy under their Cartwright Act claim. See supra Section IV.A.2. Accordingly, the Court **GRANTS** Defendants' MTS as to Plaintiff's Cartwright Act claim and **DENIES** Plaintiffs' MLD.

### 2. Claim Four: California Unfair Competition Law

As to Plaintiffs' UCL claim, as stated above, Plaintiffs lack standing to bring this claim. See supra Section IV.A.3. Thus, Plaintiffs have not shown that this claim is legally sufficient. Accordingly, the Court **GRANTS** Defendants' MTS as to Plaintiffs' UCL claim.

### 3. Claim Five: Tortious Interference with Contractual Relationship

Defendants argue that there is no probability that Plaintiffs can prevail on this claim because Plaintiffs failed to allege that Defendants knew of or intended to interfere with any of Plaintiffs' business dealings. (MTS at 11.) The Court disagrees. As the Court found above, Plaintiffs have shown that their tortious interference with contractual relationship claim is legally sufficient as to knowledge and intent. See supra Section IV.A.4. Without more, at this time, the Court cannot find that Plaintiffs' claim "lacks even minimal merit." Hilton, 599 F.3d at 908. Accordingly, the Court **DENIES** Defendants' MTS as to Plaintiff's tortious interference with contractual relationship claim.

### 4. Claim Six: Tortious Interference with Prospective Economic Advantage

As stated above, Plaintiffs have failed to adequately plead that Defendants engaged in wrongful conduct. See supra Section IV.A.5. Accordingly, the Court **GRANTS** Defendants' MTS as to Plaintiffs' tortious interference with prospective economic advantage claim.

## C. Venue

The Court has serious doubts about whether the Central District of California is the proper venue for Plaintiffs' lawsuit. The Illinois Lawsuit and the related preliminary injunction orders occurred in the Northern District of Illinois. (Chetaidou Compl. ¶¶ 33, 39.) Pursuant to 28 U.S.C. 1404(a) ("Section 1404(a)"), "a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented" if such a transfer is convenient to the parties and witnesses. Section 1404(a). The purpose of Section 1404(a) is to "prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." Van Dusen v. Barrack., 376 U.S. 612, 616 (1964). A transfer under 28 U.S.C. 1404(a) "may be ordered sua sponte so long as the parties have the opportunity to present their views on

the issue." Berman v. Brown, 2015 WL 4735522, at *2 (N.D. Cal. Aug. 10, 2015) (internal quotes omitted). Accordingly, the Court orders the parties to meet and confer on whether they stipulate to transfer venue to the Northern District of Illinois. If the parties cannot agree, either party can file a motion to transfer venue.

## V. CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows:

1. Defendants' MTD is **GRANTED-IN-PART**.

2. Defendants' MTS is **GRANTED-IN-PART**.

3. Plaintiffs' MLD is **DENIED**.

4. The February 27, 2023 hearing is **VACATED**.

5. The parties must meet and confer on whether they stipulate to transfer venue to the Northern District of Illinois. If the parties cannot agree, either party may file a motion to transfer venue by **March 13, 2023**. If neither party files a motion to transfer by March 13, 2023, both parties are **ORDERED** to **SHOW CAUSE**, in a filing not to exceed 12 pages, filed no later than **March 20, 2023**, whether this action should not be transferred to the Northern District of Illinois.

6. Plaintiffs may file an amended complaint, if any, by **March 6, 2023**.

**IT IS SO ORDERED.**